The STATE ex rel. SIMMONS

v.

GEAUGA COUNTY DEPARTMENT OF EMERGENCY SERVICES et al.

[Cite as *State ex rel. Simmons v. Geauga Cty. Dept. of Emergency Serv.* (1998), 131 Ohio App.3d 482.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 97–G–2079.

Decided Dec. 7, 1998.

484

486

*Michael A. Moses,* for relator.

*Dale H. Markowitz* and *Matthew J. Dolan,* for respondent.

*David P. Joyce,* Geauga County Prosecuting Attorney, and *Lorrie Sass,* Assistant Prosecuting Attorney, for intervening respondent Thompson Township Board of Trustees.

FORD, Presiding Judge.

This original action in mandamus is presently before this court for consideration of the parties' competing motions for summary judgment. Upon reviewing the parties' respective arguments and evidential materials, we conclude that both relator and respondents have successfully showed that they are entitled to the entry of judgment in their favor as to certain aspects of their respective claims. Accordingly, we ultimately hold that writs of mandamus should be issued in part as to all parties.

I

Relator, George Simmons, is the current duly elected Sheriff of Geauga County, Ohio. Relator has held this position since January 1993.

Respondents consist of various public entities and officials in Geauga County. The three public entities include the Geauga County Board of Commissioners, the Geauga County Department of Emergency Services, and the Thompson Township Board of Trustees. The four public officials are Bud Jordan, the Director of the Geauga County Department of Emergency Services, and the individual members

of the Geauga County Board of Commissioners: Jan Novak, William M. Repke, and Neil C. Hofstetter.[1]

The subject matter of this action concerns the right to control the operation of the countywide public safety communications system and the E–9–1–1 system of Geauga County. Pursuant to R.C. 307.63(A), such a system generally consists of the facilities, equipment, and services which assist in the immediate exchange of information between various public officials pertaining to police, fire, and emergency medical matters. As set forth in R.C. 4931.40(A), a 9–1–1 system is the mechanism by which an individual citizen of a county can request emergency services.

Prior to 1986, the Geauga County Sheriff's Department employed a low-band radio system to facilitate communications between its dispatchers and its deputies in the field. This particular system was also used for communications between the department and other public agencies in Geauga County. In addition, the department provided dispatch services for certain entities.

In early 1986, the Geauga County Board of Commissioners purchased an 800MHz communications system ("800 system"). This system primarily consisted of a computer control board, radio transmitters, and dispatch consoles. The system essentially worked in the following manner: (1) by speaking into a microphone, a dispatcher would cause a radio signal to be sent from a console to one of six towers in the county; (2) the tower would relay the signal to the computer control board; and (3) acting as the "backbone" of the entire system, the board would "process" the signal and direct it to a portable receiver or a second console.

Following the installation of the 800 system, the Board of County Commissioners entered into a number of "user" agreements with various public entities in the county, including many villages, townships, and fire departments. One of the entities which executed such an agreement was the Geauga County Sheriff's Department. Under the terms of these agreements, the Board of County Commissioners agreed to provide the "user" with access to the 800 system. In return, the user promised to abide by certain guidelines concerning the use of the system.

---

1. Although not named as a respondent in relator's amended petition, the Thompson Township Board of Trustees was granted leave to intervene as a respondent on the basis that it has an interest in the subject matter of the action. Subsequently, the township board filed its own pleadings in the action and did not join in the counterclaim of the other respondents. However, the township board has joined in the summary judgment motion of the other respondents. Thus, as used in this opinion, the term "respondents" shall refer to the township board and the other six public agencies and officials.

As part of its specific agreement, the sheriff's department was given two consoles by which to access the 800 system. As it had previously done with the low-band radio system, the department primarily used the 800 system to dispatch its employees and to communicate with other public agencies in the county. The department also continued to provide dispatch services to certain entities, including villages and townships, which did not have their own dispatch center.

Under the initial configuration of the 800 system, any communication between two users of the system could be transmitted through the consoles located at the sheriff's department. However, a communication could also be sent through the console at the Geauga County Emergency Management Agency. Moreover, after the system was upgraded in 1989, it was no longer necessary for the transmission to go through these particular consoles in order for the connection to be made. Therefore, throughout the entire time period in which the 800 system has been used, it has been possible for two users to communicate through the system without benefit of the dispatching services performed by the sheriff's department.

In conjunction with the installation of the 800 system, the Geauga County Board of Commissioners formed an 800 Communications Committee, the primary function of which was to establish the policies governing the use of the 800 system. In turn, the 800 Communications Committee hired an employee, known as the 800 Coordinator, whose duties included (1) providing for the operation and maintenance of the system, (2) overseeing the setup of the equipment at various sites and training the employees of the users, and (3) coordinating the general use of the system.

In addition to the 800 Communications Committee, two other public agencies were created in Geauga County during the early 1990's to coordinate the use of two separate communications systems. These entities were the E–9–1–1 Committee and the Geauga County Emergency Management Agency. Like the 800 Communications Committee, these entities had their own employees to perform certain duties.

In January 1992, the Geauga County Board of Commissioners gave its approval for the county's E–9–1–1 system. This system then became operable in November 1994. The system primarily consisted of six Public Safety Answering Points ("PSAP") located throughout the county. The sheriff's department is responsible for the operation of one PSAP, *i.e.*, the sheriff's dispatchers handle emergency calls from townships or other county entities which do not have their own dispatchers. The remaining PSAPs are located in certain villages and townships in the county.

After relator had assumed the position of Geauga County Sheriff in January 1993, his department continued to use the 800 system, *i.e.*, not only has the department used the system to dispatch its own employees, but it has also

continued to provide dispatch services for other public entities in the county. In conjunction with its use of the 800 system, relator's department has operated the following informational/communications equipment: (1) one of the six PSAPs in the county's E–9–1–1 system, (2) a Computer Aided Dispatch system ("CAD"), which is essentially a database in which information concerning prior incidents or dispatch calls are maintained, (3) a terminal of the Law Enforcement Automated Data System ("LEADS"), which gives the department access to other law enforcement databases throughout the country, (4) a separate radio system called the Law Enforcement Emergency Radio Network ("LEERN"), and (5) various telephone and paging systems.

In 1996, the Geauga County Board of Commissioners created a new county agency called the Department of Emergency Services. The primary function of this department was to coordinate the use of all communications systems in Geauga County, i.e., the new department assumed the duties of the 800 Communications Committee, the E–9–1–1 Committee, and the Emergency Management Agency. As part of the restructuring of authority, the employees of the preexisting entities were placed under the control of the department's director, Bud Jordan.

Upon the creation of the Department of Emergency Services, the Board of County Commissioners formulated a plan under which the new department would assume the dispatch duties of the sheriff's department. Specifically, on July 15, 1997, the Board of County Commissioners notified relator that, as of August 4, 1997, the department's dispatch center would be operated by the employees of the Department of Emergency Services.

During this same general time period, relator informed certain officials in two townships that, before he would continue to provide dispatch services to their local police departments, they would have to comply with his policies concerning the use of the 800 system. When officials in the Thompson Township Police Department failed to comply with this request, relator terminated its dispatch services in May 1997.

Upon learning of the basic plan to take control of his department's dispatch center, relator filed this action in mandamus against the six original respondents. In his initial petition, relator essentially sought an order to compel these six respondents to continue to give him the needed funding to continue to operate his dispatch center. His request for relief was based upon the basic allegation that, under R.C. 307.63, he was entitled to operate the county's "public safety communications system" because his department had been doing so prior to March 1993.

After the parties had engaged in preliminary discovery, this court granted relator leave to file an amended petition. In his new petition, relator has

broadened the scope of the requested relief. Specifically, he has asked that all respondents be compelled to (1) transfer to him all functions relating to the operation of the "entire" public safety communications system, including the 800 system and the E–9–1–1 system, (2) transfer to him control over all employees of the Department of Emergency Services, (3) give him additional equipment with which to operate the entire system, and (4) prohibit them from interfering with his operation of the department's dispatch center.

As part of their answer to relator's amended petition, the original six respondents have asserted a counterclaim in mandamus. Under this counterclaim, these respondents have alleged that they are entitled to operate the entire public safety communications system in the county because, prior to March 1993, they were providing public safety communications facilities and coordinating the communications needs of various public entities, including villages, townships, police departments, and fire departments. For their relief, these six respondents have requested an order requiring relator to take all necessary steps to permit them to operate the public safety communications system. They further seek an order compelling relator to comply with all rules and regulations governing the usage of the 800 system.

As was noted above, the Thompson Township Board of Trustees was granted leave to intervene in the instant action as a respondent. In its answer to the amended petition, the township board raised only general defenses to relator's claim of mandamus, i.e., the township board did not join in respondents' counterclaim in mandamus.

Prior to the filing of the amended petition, all respondents moved to dismiss the entire action on a number of grounds. As one basis for their motion, they argued that relator's original petition did not state a viable claim because his allegations supported the conclusion that he was not entitled to "operate" the public safety communications system. Specifically, respondents contended that they had the statutory right to operate this system because they had provided public safety communications facilities for the entire county prior to 1993. In making this argument, they did not try to state which facilities and equipment composed the "public safety communications system" for the entire county; instead, they merely referred to "the system."

In rejecting this particular argument, we began our analysis by noting that, under R.C. 307.63(F), the fact that respondents had provided certain facilities was not controlling as to the operation issue if those facilities had been operated by employees who were under the direct supervision of relator. We then emphasized that relator had alleged in his original petition that his employees had operated "the system" in general. Accordingly, we denied the motion to dismiss.

Following the denial of the motion to dismiss and the amendment of the parties' respective pleadings, the parties engaged in further discovery. The completion of this process has now led to the filing of the competing motions for summary judgment as to relator's sole claim and respondents' sole counterclaim.

## II

Prior to addressing the merits of the summary judgment motions, we would note that respondents have moved to strike some of the evidential materials that relator has attached to his summary judgment motion. Specifically, respondents request that the following materials be excluded from our consideration: (1) the affidavits of Donald A. Bishop, Alan L. Word, James J. Cerenelli, Dwight E. Radcliff, Daniel W. Beck, Robert A. Cornwell, and Richard C. Ford, (2) the transcript of the testimony given by Gregory C. Berquist during the preliminary injunction hearing in this action, and (3) a copy of an opinion letter written by the Geauga County Prosecutor's Office in September 1993.

In relation to the affidavits of the first five individuals, our review of these five documents shows that each contains the statement that a county sheriff is more qualified to operate the county's public safety communications system than the board of county commissioners. For example, upon indicating that he was the duly elected sheriff of Williams County, Ohio, Alan L. Word averred in his affidavit:

"I understand the duties and responsibilities involved in the Office of the Sheriff. The duties and responsibilities of the Sheriff include but are not limited to court security, corrections, civil process, road patrol, criminal investigations, crime prevention as well as being responsible for emergency services throughout the County. I understand that I am totally responsible for the direction of safety and well being of the citizens and property within Williams County. It is vital that the Sheriff have an efficient and experienced public communications system to properly perform the duties the office required.

" * * *

"I am familiar with the controversy in Geauga County. It is my opinion from personal experience that the Sheriff must have control of the public safety communications system as he is responsible for the county's safety in its entirety. My experience since the Communications Agency in Williams County was taken from my control is that it has not been run as efficiently. It is not as cost effective. I do not feel that the personnel have the needed understanding of the operation and working knowledge of law enforcement. I do not feel, in our situation, that there has been the needed administrative and supervisory skills of a seasoned law enforcement person."

As will be discussed below, R.C. 307.63 governs the determination of whether a sheriff is entitled to operate the county's public safety communications system. As a result, our decision in the instant case will be based solely upon our interpretation of this statute. Because the interpretation of a statute involves a legal determination, any opinion as to a sheriff's ability to run the system is irrelevant. Thus, the statements in question will not be considered by us in rendering our decision.

Our review of the five affidavits in question indicates that they contain conclusory statements concerning what equipment constitutes the public safety communications system. For example, Dwight E. Radcliff, the Sheriff of Pickaway County, stated in his affidavit: "The countywide safety communications system consists of enhanced 9–1–1 telephones, other telephones, radios (including LEERN), dispatchers and computers (including LEADS), which serve the communications needs of Pickaway County."

In relation to this type of statement, this court would note that R.C. 307.63(A) sets forth a specific definition of the term "countywide public safety communications systems." Hence, in determining which equipment constitutes this system in Geauga County, we are bound to apply this definition to the facts of this case.

As a general proposition, the construction and interpretation of a statute involves a question of law, not a factual issue. *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 466, 639 N.E.2d 425, 430; *In re Richardson* (July 10, 1998), Erie App. No. E–97–140, unreported, 1998 WL 456600. As a result, expert opinion is not admissible to "assist" the court in making its decision. *Sikorski v. Link Elec. & Safety Control Co.* (1997), 117 Ohio App.3d 822, 831, 691 N.E.2d 749, 755.

As to the issue of which equipment constitutes the public safety communications system in the instant action, the sole factual question will be how specific equipment is used by relator and other law enforcement officials in the performance of their duties. Once this factual question is settled, it will then be a legal question as to whether the equipment should be considered part of the system. Therefore, none of the statements in the five affidavits are admissible evidence.

A similar analysis is applicable to the remaining two affidavits. In his affidavit, Robert A. Cornwell makes averments as to the intent of the Ohio General Assembly in enacting R.C. 307.63. However, our interpretation of the statute must be based solely upon its wording and proper legislative history. Thus, as Cornwell's averments do not constitute competent evidence which we can consider in interpreting the statute, his affidavit must be stricken.

■ In regard to the affidavit of Richard C. Ford, this court would note that Ford was a member of the Geauga County Board of Commissioners during the late 1970's. As the basic averment in his affidavit, Ford states in a conclusory fashion that the Geauga County Board of Commissioners has never run the public safety communication system.

Again, we hold that this averment cannot be considered because the resolution of the issue of who has previously "operated" the system will turn upon what constitutes "operation" for purposes of R.C. 306.63. As this involves a question of law, Ford's averment is merely an opinion which is not admissible. In relation to the "operation" issue, the factual issues will be (1) how did the respective parties use the equipment which constitutes the system, (2) which party was responsible for setting up the system and maintaining it in proper working order, and (3) which party exercised control over the employees who maintained the system.

■ As to Gregory Berquist's testimony, our review of the transcript indicates that the crux of the testimony concerned the effect of the improper use of a LEADS terminal. The purpose of this testimony was to show what supposedly could take place if relator's LEADS terminal was operated by respondents. As the possible effect of respondents' operation of the public safety communications system is irrelevant to our determination, Berquist's testimony is likewise not properly before us.

■ Finally, as to the prior opinion letter of the Geauga County Prosecutor's office, our review of this document indicates that it would tend to show that the prosecutor had told the Geauga County Board of Commissioners in September 1993 that it, the board, could not operate the public safety communications system. Because this document is relevant to the factual background of this case, it is clearly admissible. Nevertheless, we would emphasize that the opinion is not binding upon us in interpreting R.C. 307.63.

Pursuant to the foregoing analysis, this court holds that the seven affidavits and Berquist's testimony are not properly before us. To that extent, respondents' motion to strike has merit.

### III

Turning now to the merits of this case, we would begin our discussion by noting that the primary focus of our analysis shall be to determine which party has the right to operate the Geauga County public safety communications system. Although the operation of the E–9–1–1 system was raised in relator's amended petition, the bulk of the parties' argument and evidential materials have related solely to the issue of the operation of the public safety communications system.

Moreover, as will be discussed below, the resolution of the E-9-1-1 issue is quite simple in comparison to the primary issue of this case.

Our review of the parties' respective summary judgment motions and evidential materials indicates that our resolution of the instant action shall turn upon the determination of three issues: (1) what facilities, equipment, and services constitute the "public safety communications system" of Geauga County, (2) does relator have the basic statutory right to "operate" the county's public safety communications system, and (3) notwithstanding any right of relator, must relator defer the operation of the public safety communications system to the Geauga County Board of Commissioners because that board had been providing public safety communications facilities prior to March 1993?

Our determination of all three issues will be based upon our interpretation of R.C. 307.63, which governs both the formation and operation of a countywide public safety communications system. Division (A) of this statute sets forth the definition of such a system:

"As used in this section, 'countywide public safety communications system' means a system of communications facilities, equipment, and services that helps to provide immediate field exchange of police, fire, and emergency medical services information between the county and participating states, political subdivisions, and other public entities, without regard to which jurisdiction holds title to real or personal property used in the system or employs the persons responsible to dispatch emergency personnel using the system."

In attempting to apply this definition to the facts of this case, respondents contend that the 800 system which the Geauga County Board of Commissioners purchased in 1986 constitutes the entire public safety communications system for Geauga County. On the other hand, relator submits that the definition not only covers the 800 system, but also covers the other information/communications equipment that his department uses as part of the dispatch process.

▆▆▆ Under the statutory definition, communications facilities, equipment, and services will be considered a part of a county's public safety communications system only when they are employed to facilitate the immediate field exchange of information between the officers of the various police, fire, and emergency medical departments in the county. As to this point, this court would note that the wording of statutory definition does not support the conclusion that it was intended to encompass any communications facilities or equipment from which the information is obtained, *i.e.*, given the specific use of the word "exchange" in the definition, it follows that R.C. 307.63 was meant to apply only to those communication facilities, equipment, and services which enable the officer of one department to convey "field" information to an officer of a second department.

Our interpretation of R.C. 307.63 garners some support from a recent opinion by the Ohio Attorney General:

"The General Assembly has not enacted a separate definition of the phrase "immediate field exchange of police, fire, and emergency medical services information" for purposes of R.C. 307.63(A). In light of the context in which it appears in R.C. 307.63(A), we interpret it as connoting the instantaneous communication of information between or among individual police, fire, emergency medical services personnel of the state, political subdivisions, or other public entities, for the purpose or in the course providing appropriate emergency aid or assistance to persons who have requested that aid or assistance.

"Thus, a countywide public safety communications system enables police, fire, and emergency medical services personnel of either the same or different political subdivisions to have direct communications with each other for the purpose of coordinating their provision of emergency aid or assistance." 1998 Ohio Atty. Gen.Ops. No. 98–032, at 2, fn. 1.

Under the last sentence of the foregoing quote, communications equipment must "enable" the transmission of information before it can be considered a part of the public safety communications system.

■ Clearly, the 800 system in the instant case constitutes communications equipment that facilitates the immediate exchange of information. As part of their evidential materials, respondents have submitted with their motion for summary judgment the affidavit of Eric Broviak, who was the coordinator of the 800 system for approximately ten years. In his affidavit, Broviak gave a sufficient description of the mechanics of the 800 system to show that the 800 system has the capability to allow an officer in one department to communicate with an officer in a second department. Moreover, this court would again note that relator has essentially admitted in his summary judgment motion that the 800 system has this capability.

■ However, this is not true of the other communications equipment to which relator has made reference. For example, the LEADS terminal in relator's department provides access to a database that contains information about judicial proceedings and criminal histories. Although relator's employees can communicate over LEADS, he readily admits in his motion for summary judgment that these communications are only with other law enforcement agencies and only for the purpose of seeking the detention of a fugitive on a warrant. Thus, the LEADS terminal cannot be considered a part of the countywide public safety communications system because it does not assist in the general exchange of information between all three types of emergency departments.

 The foregoing analysis is also applicable to the other communications equipment cited by relator. Although the department's paging system can be employed to convey information, relator admitted in his deposition that this system was employed only to communicate to particular fire departments. Similarly, relator averred in his deposition that his separate radio systems are employed merely to communicate with other law enforcement agencies. Finally, the evidential materials show that the various telephone lines are generally used to obtain information on emergency situations, not to convey the information to officers in the field.[2]

While this court would certainly agree that the foregoing equipment plays an important role in the performance of relator's duties, that is not sufficient to satisfy the definition in R.C. 307.63(A). By requiring that communications equipment must assist in the exchange of information between the police, fire, and emergency medical departments in a county, the General Assembly has limited the scope of the equipment that can be considered a part of a public safety communications system.

 Furthermore, we would emphasize that the fact that R.C. 307.63(A) specifically refers to the exchange of information "between" political subdivisions and other public entities supports the conclusion that each of the various entities must have access to the equipment at issue before it can be deemed a part of the system. Since the equipment to which relator has referred is not accessible to all "users" of the system, it cannot be considered part of the entire system.

Accordingly, under the first step of our analysis, this court concludes that the 800 system constitutes the entire public safety communications system of Geauga County.

In conjunction with his argument on this basic issue, relator asserts that he has been the "operator" of the county's public safety communications system since he took office in 1993. This assertion appears to be predicated upon the extent of his use of the 800 system.

---

2. In support of his argument that the foregoing equipment is also a part of the county's public safety communications system, relator refers to the deposition testimony of Ronnie Eging, who is an employee of the Geauga County Department of Emergency Services. As part of his deposition, Eging stated that it was his opinion that the 800 system was only a part of the county's public safety communications system.

 However, because the determination of whether certain equipment is a part of the public safety communications system is controlled by the statutory definition, it is purely a legal question. As a result, Eging's statement does not raise a factual issue on this point because it is not competent evidence. Instead, the only relevant evidence is that which describes the function of the equipment in question.

However, the evidential materials before us indicate that there is no dispute that other police departments in the county use the 800 system to dispatch their officers. There is no indication in these evidential materials that the nature of the use of the other departments is any different from the nature of relator's use, except to the extent of his use. In this respect, relator is not the "operator" of the 800 system, but is merely the primary user.

In addition, respondents' evidential materials support the finding that the Geauga Board of County Commissioners and the 800 Communications Committee were the sole county entities which exercised any type of control over the entire system. As part of his affidavit, Broviak stated that the "Commissioners, through the Committee, adopted policies and rules for the administration, operation, and maintenance of system." Broviak also stated that it was his exclusive responsibility to maintain and coordinate the use of the 800 system. In responding to respondent's summary judgment motion, relator has not set forth any evidential materials that would raise a factual dispute as to the foregoing matters.

Finally, in relation to the foregoing issue, this court would note that, despite the heavy emphasis relator has placed upon the factual question of whether he has operated the 800 system in the past, it is not controlling as to whether he has the right to operate it in the future. As will be discussed below, the outcome of the ultimate issue in this case will turn upon whether respondents had been providing public safety communications facilities prior to 1993.

The question of which public official or entity may operate a countywide public safety communications system is the subject of two divisions of R.C. 307.63. The first is division (B):

"A board of county commissioners may establish a countywide public safety communications system. The system shall be operated in accordance with division (B)(1), (2), or (3) of this section.

"(1) In any county with a population of less than seven hundred fifty thousand, the county sheriff shall operate the countywide public safety communications system unless, before commencing operation of the system, the sheriff gives written notice to the board of county commissioners that he chooses not to do so. After the board of county commissioners receives such written notice from the sheriff, the board shall operate the system. * * *

"(2) In any county with a population of seven hundred fifty thousand or more, the board of county commissioners shall operate the system, unless the board and the county sheriff mutually agree that the sheriff will operate the system.

"(3) In any county, after the board of county commissioners commences operation of a public safety communications system, if the board chooses to stop operating the system, the county sheriff may operate the system."

In the instant action, relator's evidential materials indisputably establish that the population of Geauga County is less than seven hundred fifty thousand. His materials also demonstrate that he has never given written notice to the Geauga County Board of Commissioners that he did not wish to operate the 800 system. Accordingly, because the first contingency in R.C. 307.63(B) is applicable to the facts of this case, relator has a basic right to operate the county's public safety communications system.

However, our discussion of the "right to operate" issue does not end here. As respondents aptly note in their summary judgment motion, R.C. 307.63(F) sets forth an exception to the general rule in R.C. 307.63(B):

"(F) The authority granted to a county sheriff under division (B) of this section to operate a countywide public safety communications system does not apply in any county where, on and before the effective date of this section, the board of county commissioners is providing public safety communications facilities to, or coordinating the public safety communications needs of, municipal corporations, townships, or other entities or officials by means of officials or with employees not under the direct supervision of the county sheriff. However, if such a board of county commissioners and the county sheriff mutually agree that the sheriff will operate a countywide public safety communications system, he may operate it."

As was noted above, the issue of the proper interpretation of R.C. 307.63(F) was previously raised in respondents' motion to dismiss. In this motion, respondents simply contended that they were entitled to operate the county's public safety communications system because they had been providing public safety communications facilities prior to March 15, 1993, the effective date of R.C. 307.63. In raising this argument, they did not attempt to state what was the composition of the public safety communications system of Geauga County. Respondents also did not address the issue of whether they had been providing this system with employees who had not been supervised by relator. In rejecting respondents' argument, this court stated in our judgment entry:

"As to this point, this Court would emphasize that the phrase cited by Respondents is followed by the phrase: ' * * * or coordinating the public safety communications needs of, * * *.' Thus, division (F) sets forth two contingencies under which a county sheriff has no authority to operate the system: (1) prior to the effective date of the statute, the board of county commissioners provided facilities for the system; or (2) prior to the effective date, the board was coordinating the communications needs of entities in the county.

"This Court would also note that the references to the two contingencies is followed by a third phrase: ' * * * by means of officials or with employees not under the direct supervision of the county sheriff.' Upon considering this latter

phrase in the context of the entire provision, we conclude that the Ohio General Assembly intended for the phrase to apply to both contingencies. That is, we hold that the first contingency under R.C. 307.63(F) will not apply to deprive a county sheriff of his authority under division (B)(1) unless the facilities provided prior to the effective date of the statute were operated by employees which were not under the direct supervision of the sheriff.

"Clearly, the general purpose of R.C. 307.63(F) was to enable a board of county commissioners to maintain authority over a 'preexisting' public safety communications system when the county sheriff had not previously exercised any control over the operation of the system. If this Court were to hold that the 'employees' phrase was inapplicable to the 'facilities' contingency, this purpose would be defeated."

In now moving for summary judgment on the basis of the exception in R.C. 307.63(F), respondents have revised their argument considerably. First, they submit that, in order for the exception to apply, it is not necessary for them to show that they had been providing dispatch services prior to March 1993. Second, they contend that the exception is applicable under the facts of this case because, prior to March 1993, they had been providing public safety communications facilities, i.e., the 800 system, which were not operated by employees under the direct supervision of relator. Third, they assert that the exception is also applicable on the basis that, prior to March 1993, their employees had been coordinating the public safety communications needs of various public entities in Geauga County.

In relation to the first aspect of their argument, respondents correctly note that the two possible alternatives in R.C. 307.63(F), providing facilities or coordinating needs, does not include all three parts of a public safety communications system, as defined in R.C. 307.63(A). Specifically, they note that, unlike R.C. 307.63(A), R.C. 307.63(F) does not contain any reference to the providing of services in relation to the public safety communications system. Based upon this, respondents maintain that the exception can be applicable even if they did not provide any services except coordinating the needs of the public entities, i.e., they maintain that they were not required to provide dispatch services.

This court finds this argument to be persuasive. If the Ohio General Assembly had intended to require a board of county commissioners to provide general services before it could operate the public safety communications system, it would have used the term "services" in R.C. 307.63(F), just as it had in R.C. 307.63(A). The fact that it referred to only one type of service, coordinating the public entities' needs, supports the conclusion that no other type of services need be given.

In turn, it logically follows that the Ohio General Assembly did not intend for the operation of a public safety communications system to necessarily entail the providing of dispatch services. Stated differently, the use of a public safety communications system to dispatch law enforcement officials does not equate to the operation of such a system, as relator contends in his summary judgment motion. Instead, the providing of services and the coordinating of needs are the characteristics of operation.

The Ohio General Assembly's decision to allow a board of county commissioners to operate a public safety communications system based solely upon its compliance with one of the two alternatives in R.C. 307.63(F) appears to be based upon the fact that a county sheriff may not be the sole user of the system. Because other law enforcement agencies may also be using the system, it follows that disputes could arise as to the proper use of the system. By granting a board of county commissioners the opportunity to operate the system, the Ohio General Assembly has recognized that a board could act as a neutral administrator of the system.

The specific facts of this case show the wisdom of the legislature's decision. A dispute exists between relator, the biggest user of the system, and the other users. Under such circumstances, it is logical that the board of county commissioners should be the one to set a policy which tries to accommodate the interests of all users.

In previously moving to dismiss on the basis of the exception in R.C. 307.63(F), respondents simply argued that they were entitled to operate the county's public safety communications system because they had provided the facilities for such a system. In doing so, they never asserted that they had provided these facilities with employees who were not under the direct supervision of relator. If respondents had raised this specific issue in their motion to dismiss, our ultimate holding on the motion might have been different. However, at that particular juncture of this action, we had before us only relator's general allegation that he had control of the employees who "operated" the system.

Now, in moving for summary judgment, respondents have not only demonstrated that they provided facilities with employees who were not under relator's supervision, but have also shown that they coordinated the needs of the participating entities with employees who were not under his supervision.

In relation to the providing of facilities, the affidavit of the 800 Coordinator, Eric Broviak, establishes that (1) the 800 system was purchased by the Geauga County Board of Commissioners, (2) Broviak had been solely responsible for installing and maintaining the entire 800 system, and (3) Broviak has never worked under the direct supervision of relator. Specifically, we would emphasize that Broviak's affidavit has the following averments:

"Affiant states that at all times he was employed by the Commissioners and the Commissioners authorized his hiring, paid his salary and had the exclusive authority to retain, promote or terminate his employment;

"* * *

"Affiant was exclusively responsible for the operation, maintenance and coordination of the radio transmitter and the computer control system. Affiant also coordinated the operation and training of the dispatch system for the EMA, Sheriff's Office, Chardon Village Police, Middlefield Village Police, Chesterland Township Police and Bainbridge Township Police;

"* * *

"Affiant further had the exclusive responsibility through 1996 to work with each of the police departments in Geauga County which had dispatching capabilities and used the System. Affiant set up or oversaw the setup of the equipment, programmed the radios with passwords and identification numbers known only to him for the police and fire departments and in Chardon Village, Middlefield Village, Chesterland and Bainbridge Townships and the EMA. Each of these law enforcement agencies received equipment for the System which was substantially similar to that received by the Sheriff's Office * * *."

As to the coordination of needs, Broviak indicated in the affidavit that the 800 Communications Committee had been solely responsible for setting the policy and regulations concerning the use of the 800 system. Broviak also indicated that the committee was not under the direct supervision of relator.

In responding to respondents' motion for summary judgment, relator has not submitted any evidentiary material which would contest the basic averments in Broviak's affidavit. Instead, relators' materials merely focus upon the questions of the nature of his use of the system and whether he would operate the system in a more efficient manner. As relator has failed to raise any factual dispute in relation to the matters set forth in Broviak's affidavit, this court is required to consider the averments as true for purposes of summary judgment.

▆▆▆ Pursuant to this analysis, this court holds that respondents have demonstrated that the exception in R.C. 307.63(F) is applicable under the facts of this case. Accordingly, relator is not entitled to operate Geauga County's public safety communications system; instead, such right belongs to the Geauga County Board of Commissioners. In turn, as the operator of the system, the board has the further right to set all policy concerning the use of the system, and relator, as a user of the system, has an obligation to comply with those policies.[3]

---

3. As an aside, this court would emphasize that, even if we were to hold that relator was entitled to operate the county's public safety communications system, it would not follow that

As to the issue of use, we also conclude that, even if the providing of dispatch services is not a part of the "operation" of the system, there is nothing in R.C. 307.63 which would prohibit the Geauga County Board of Commissioners from maintaining their own dispatch center. That is, our review of R.C. 307.63 supports the conclusion that the board can use the system in the same manner as any other user, including the operation of its own dispatch center.

Nevertheless, this does not mean that relator must relinquish control of his own dispatch center to respondents. As to this point, we would note that R.C. 307.63(G) states that a county sheriff of a county with a population of less than seven hundred fifty thousand is not required "to use the public safety communications system to dispatch his employees."

We interpret R.C. 307.63(F) to give a county sheriff two options when he is not entitled to operate the public safety communications system. First, a county sheriff can choose to use a communications system that is separate from the countywide public safety communications system. Under this option, relator can choose not to use the 800 system in Geauga County if he believes that the rules imposed by respondents as to his use will adversely affect the dispatch of his employees.

Second, a county sheriff can choose to operate his own dispatch center over the countywide public safety communications system. That is, this court concludes that the granting of the right to use a separate communications system necessarily entails the right to dispatch employees over the countywide public safety communications system through the employment of separate dispatchers. Of course, this right to operate a separate dispatch center over the countywide system would be subject to any rule or regulation set by the board of county commissioners.

Under this second option, relator has the choice in the instant case of maintaining his present dispatch center and continuing to operate it over the 800 system. If relator chooses this option, respondents could only regulate relator's use of the system, *i.e.*, respondents cannot take over relator's dispatch center. Instead, respondents can only set up a separate dispatch center that can be used by the remaining users of the 800 system.

---

he also would have the right to operate the county's E–9–1–1 system. R.C. 4931.40(A) provides that a 9–1–1 system is one that enables a private individual to request emergency services. As such, a 9–1–1 system does not satisfy the definition of a countywide public safety communications system because it does not provide for the exchange of field information. See 1998 Ohio Atty.Gen.Ops. No. 98–032. Furthermore, we would note that, in allowing for the establishment of a 9–1–1 system, R.C. 4931.40 *et seq.* does not refer to R.C. 307.63.

██ Stated differently, regardless of which option relator may follow, respondents do not have any authority to exercise any direct control over relator's dispatch center and his employees. Although respondents have the right to operate the county's public safety communications system, they must permit relator to operate his dispatch center in any manner he chooses, so long as his use of the system is in compliance with the rules and regulations applicable to all users of the system.[4]

Finally, this court would again note that, in reaching the foregoing conclusions, we have not considered the issue of which of the parties are more qualified to operate a dispatch center and the entire countywide public safety communications system. In light of our interpretation of R.C. 307.63, we conclude that the determination of which entity is better qualified to run the system is irrelevant to our ultimate holding. Instead, that holding has been predicated solely upon our interpretation of the statute. If this interpretation should adversely affect the operation of the county's public safety communications system, that is a policy question which the Ohio General Assembly must consider.[5]

## IV

██ As a general proposition, a motion for summary judgment must be granted when the moving party has established that there is no genuine issue of fact remaining to be litigated, he is entitled to judgment as a matter of law, and that the state of evidential materials is such that reasonable minds could only reach a conclusion which is adverse to the nonmoving party. *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 617 N.E.2d 1129. Thus, in moving for summary judgment on a mandamus claim, a relator/plaintiff must satisfy the foregoing standard in relation to the following three elements: (1) the relator/plaintiff has a clear right to the requested relief, (2) the respondent/defendant

---

4. As part of his prayer for relief, relator has requested that respondents be required to provide additional communications equipment. However, as part of his argument in his motion for summary judgment, relator has not attempted to show that this equipment is necessary for his operation of his dispatch center, as compared to the 800 system and the E-9-1-1 system. Thus, relator's request is overruled.

5. In regard to the dissenting opinion, the majority notes that, at the beginning of his analysis, Judge O'Neill makes factual conclusions without any reference to specific evidential submissions in the form of depositions or affidavits provided by the parties. Further, his comment that the "magistrate to whom the matter was referred more than a year ago recognized that obvious fact" is an erroneous statement. We would emphasize that the quote in the dissenting opinion is taken from a judgment entry of this court in which we, not the magistrate, denied respondents' motion to dismiss relator's petition. That judgment entry did not contain any factual determination.

Finally, we fail to find in the dissenting opinion any legitimate factual or legal analysis supported by either the record or any recognized jurisprudential authority.

has a clear legal duty to perform the act, and (3) the relator/plaintiff has no adequate remedy at law. *State ex rel. Manson v. Morris* (1993), 66 Ohio St.3d 440, 441, 613 N.E.2d 232, 233–234.

Pursuant to the foregoing analysis, this court concludes that, as to certain aspects of his mandamus claim, relator in the instant action has met the standard for summary judgment as to each of the foregoing elements. Based upon this, relator is entitled to the entry of judgment in part on his claim and respondents' counterclaim. Specifically, we hold that (1) relator is entitled to continue to operate his own dispatch center over the Geauga County public safety communications system, (2) respondents cannot take any steps to take control of the operation of his dispatch center, (3) respondents cannot interfere in the internal operation of his dispatch center, and (4) if relator chooses to continue to provide dispatching services to various entities in Geauga County, including Thompson Township, he is entitled to set any policy or regulation concerning the matter in which those entities communicate with his department, so long as the policy or regulation do not conflict with the general policy or regulation set forth by the Geauga County Board of Commissioners.

Likewise, this court concludes that, as to certain aspects of their counterclaim in mandamus, respondents have satisfied the summary judgment standard as to the three elements of such a claim. Based upon this, respondents are entitled to judgment in part on their counterclaim and relator's mandamus claim. Specifically, we hold that (1) the Geauga County Board of Commissioners is entitled to operate the county's public safety communications system, (2) in operating this system, the Geauga County Board of Commissioners has the right to run a dispatch center which is separate from the dispatch center operated by relator, (3) the Geauga County Board of Commissioners is entitled to set policy and regulations concerning the use of the system, (4) relator is not entitled to exercise control over the operation of the 800 communications system and the E–9–1–1 system, and (5) relator is not entitled to receive any additional equipment which does not pertain to his operation of his dispatch center.

To the foregoing extent, relator's motion for summary judgment is granted in part as to his mandamus claim. It is the order of this court that a writ of mandamus shall be issued compelling respondents to continue to provide funding to relator to the extent that is needed for him to operate his dispatch center. In all other respects, relator's motion for summary judgment is overruled, and judgment is hereby entered in favor of respondents on relator's claim to that extent.

To the foregoing extent, respondents' motion for summary judgment is granted in part as to their mandamus counterclaim. It is the order of this court that a writ of mandamus shall be issued compelling relator to comply with any policy or

regulation promulgated by the Geauga County Board of Commissioners concerning the operation of the public safety communications system. In all other respects, respondents' motion for summary judgment is overruled, and judgment is hereby entered in favor of relator on respondents' counterclaim to that extent.

*Judgment accordingly.*

CHRISTLEY, J., concurs.

WILLIAM M. O'NEILL, J., dissents.

WILLIAM M. O'NEILL, Judge, dissenting.

I must respectfully dissent. The issue before this court is straightforward and relatively easy to understand. Prior to filing this action, the Sheriff of Geauga County ran the *only* "countywide public safety communication system" as defined by R.C. 307.63 in Geauga County. There was *no* other countywide public safety communications system in operation anywhere in the county. The magistrate to whom this matter was referred more than one year ago recognized that obvious fact when he recommended, and this court found:

" 'Clearly, the general purpose of R.C. 307.63(F) was to enable a board of county commissioners to maintain authority over a "preexisting" public safety communications system when the county sheriff had not previously exercised any control over the operation of the system. If this Court were to hold that the "employees" phrase was inapplicable to the "facilities" contingency, this purpose would be defeated.' " *State ex rel. Simmons v. Geauga Cty. Dept. of Emergency Services* (Dec. 8, 1997), Geauga App. No. 97–G–2079, unreported, at 7.

The majority has now chosen to decide, as a matter of law, that the Geauga County Commissioners in fact "ran" the county's public safety communications system by providing equipment and maintenance personnel for the 800 system. Such a tortured use of the English language would be analogous to suggesting that the United States Congress runs the U.S. Air Force, since Congress owns the F–16's.

To follow the reasoning to its logical conclusion, one could readily find, as a matter of law, that the Geauga County Commissioners *run* the coroner's office since they provide the instruments used to perform the autopsies. Surely no one would suggest that the duly elected coroner, a highly trained specialist, shares his responsibilities with the commissioners who coordinate where his office is located.

At the risk of belaboring the inquiry, can the majority's analysis now be utilized to suggest that the commissioners, and not the duly elected county engineer, *run* the highway department?

The state of Ohio, through its statutes, has consistently divided responsibilities among various elected office holders according to their respective abilities to perform the tasks at hand. Thus, we have engineers, coroners, auditors, treasurers, and sheriffs each with a job to do.

This court is taking what I believe to be a dangerous step when it decides that public safety communications systems belong in the hands of politicians rather than duly elected and trained safety forces. Such a finding, in my opinion, is contrary to Ohio law and creates a patently absurd result. In our earlier judgment entry, this court told the county commissioners to keep their hands off the sheriff's countywide communications system. Nothing in my mind has changed that interpretation of the Ohio Revised Code.

The sheriff's petition should be granted and he should be permitted to do the job he was elected to do without interference by unqualified, untrained, nonsafety force personnel.